# In the United States Court of Federal Claims

No. 06-799T

(Filed May 16, 2008)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * | Tax; refund of penalty for underpayment due to fraud, 26 U.S.C. ("I.R.C.") § 6663(a) (2000); burden of proof; clear and convincing evidence. |
| **ROBERTO and MARIA L. GAGLIARDI,** | |
| Plaintiffs, | |
| v. | |
| **THE UNITED STATES,** | |
| Defendant, | |
| * * * * * * * * * * * * * * * * * * * * * * * | |

Frank Agostino, Hackensack, NJ, for plaintiff. Anica John and Steven Bashker, Calo Agostino, PC, of counsel.

Jennifer Dover Spriggs, Washington, DC, with whom was Assistant Attorney General Nathan J. Hochman for defendant. G. Robson Stewart, and Richard H. Bowles, Department of Justice, of counsel.

## MEMORANDUM OPINION AND ORDER

**MILLER,** Judge.

This tax refund suit is before the court following a two-day, five-witness trial. The Internal Revenue Service (the "IRS") determined that the taxpayers understated their income for the 2000 and 2001 tax years. This understatement led to an assessment for underpayment of tax. The IRS attributed the underpayment to fraud and imposed a 75% fraud penalty for the 2000 and 2001 tax years pursuant to 26 U.S.C. ("I.R.C.") § 6663(a) (2000). Plaintiffs sued for a refund of $17,742.75 in fraud penalties. Trial focused on whether the Government discharged its burden to prove, by clear and convincing evidence, that the taxpayers acted with the requisite *mens rea*: omission motivated by an intent to evade payment of income tax. When defendant rested, plaintiffs moved pursuant to RCFC 52(c) for judgment on partial findings. Following argument on the motion, the court indicated that the motion would be granted as to both plaintiffs and that an opinion would enter setting forth the grounds for granting the motion and the court's findings of fact and conclusions of law pursuant to RCFC 52(a). See Order entered Mar. 14, 2008.

**FACTS** 1/

Plaintiffs Roberto and Maria L. (MariaLucia) Gagliardi, husband and wife, reside in Woodridge, NJ. Dr. Roberto Gagliardi is a dentist, who in 2000 practiced dentistry in two locations under two practice names: Union City, NJ, as "Roberto Gagliardi" (the "Union City practice"); and Fair Lawn, NJ, as "Family Dentistry of Fair Lawn, LLC" ("Family Dentistry"). In 2001 Dr. Gagliardi practiced dentistry in three locations: the Union City Practice; Family Dentistry; and an additional practice in Fair Lawn, NJ, "Restorative Dentistry" ("Restorative Dentistry"). Mrs. Gagliardi is currently a homemaker and during 1984-1990 worked as a bank teller. Beginning in 1991 Mrs. Gagliardi performed bookkeeping for her husband's Union City practice. Plaintiffs filed joint returns for the 2000 and 2001 tax years.

After an audit of plaintiffs' returns for the 2000 and 2001 tax years that commenced on January 28, 2003, the IRS adjusted the amount of tax due by $17,917.00 for the 2000 tax year and by $5,740.00 for the 2001 tax year and imposed penalties for fraud in the amount of $13,437.75 for the 2000 tax year and $4,305.00 for the 2001 tax year. On July 14, 2004, plaintiffs' accountant, Lawrence B. Goodman, CPA, the senior partner of Lawrence B. Goodman, P.A., who prepared plaintiffs' tax returns for both tax years and who held a power-of-attorney from plaintiffs to represent them during the IRS audit beginning in 2003, signed a Form 870 consenting to the assessment and collection of deficiencies, including fraud penalties under I.R.C. § 6663(a).

Plaintiffs filed on September 10, 2004, with the Commissioner of the IRS claims for refund of the fraud penalties assessed for the 2000 and 2001 tax years. The "Explanation and additional claims" portion of both claims reads identically and asserts that the taxpayers' representative, Mr. Goodman, "agreed to a fraud penalty without our knowledge or consent" and that, in any case, the taxpayers "gave [their] accountant access to all [their] books and records." DX 3 and 4. Plaintiffs requested "abatement of the fraud penalty and the interest on the fraud penalty." Id. The Commissioner denied plaintiffs' claims for refund by letters dated December 9, 2004, and June 1, 2005. Plaintiffs filed this refund action in the United States Court of Federal Claims on November 29, 2006. Notably, plaintiffs do not contest the underpayment, which defendant refers to as unreported income.

In tax refund suits involving the assessment of a fraud penalty, the Government bears the burden of proving fraud by clear and convincing evidence. See Irolla v. United States,

---

1/ The facts set forth in the Facts section of this opinion, together with those included in the Discussion section, constitute the court's findings.

390 F.2d 951, 953 (Ct. Cl. 1968) (discussed more fully *infra* Discussion part II). For this reason the court directed defendant to present its case-in-chief before plaintiffs opened their case. Defendant called five witnesses: Dr. Gagliardi; Mrs. Gagliardi; Carole D. Downey (now Anderson-Downey), plaintiffs' bookkeeper from 2000 to 2001; Mr. Goodman; and Mary M. Wieme, the IRS revenue agent conducting the IRS's audit.

Plaintiffs established three bank accounts, each corresponding to one of the three dental practices (the "business bank accounts"). The bulk of the income from each of the dental practices was deposited into the corresponding business bank account. In the course of the audit, Ms. Wieme identified deposits of income from the dental practices made to three other bank accounts: a bank account with Fleet National Bank in the name of Dr. Gagliardi and his mother (the "shared Fleet account"); a bank account with Fleet National Bank in Mrs. Gagliardi's name ("Mrs. Gagliardi's Fleet account"); and a bank account with Kearny Federal Savings Bank in Dr. Gagliardi's name (the "Kearny account"). The income from the dental practices that was not reported in plaintiffs' 2000 and 2001 tax returns correlated with the deposits of income from the dental practices into these three non-business accounts in 2000 and into the Kearny account in 2001. Plaintiffs did not dispute that they made these deposits, nor do they contest that an underreporting of income on their 2000 and 2001 tax returns led to an underpayment of tax. They argued, however, that they informed Mr. Goodman about the deposits of additional income to the three personal accounts, that Mr. Goodman was responsible for the preparation of the tax returns and that he exceeded his scope of authority in agreeing to the fraud penalties. Plaintiffs stand on their *bona fides* that they did not intend to evade taxes and that the IRS's assessment of the fraud penalty cannot be sustained.

Mr. Goodman had a long-standing personal and professional relationship with plaintiffs that predated their marriage; he was the accountant for Mrs. Gagliardi's father, and Mrs. Gagliardi met Mr. Goodman for the first time during the early 1970s when she was fifteen to sixteen years old. At that time Mrs. Gagliardi began helping her father with his business payroll, and Mr. Goodman taught her how to keep the payroll books and records. Tr. at 198-99. When Dr. and Mrs. Gagliardi married in 1989, Mr. Goodman became their accountant and prepared their tax returns. 2/ Mrs. Gagliardi also recounted that Mr.

---

2/ Mr. Goodman acted as bookkeeper for the dental practices until plaintiffs hired Ms. Downey and she began providing QuickBooks data to Mr. Goodman's office. He described the bookkeeping function as "record[ing] the cash receipts and disbursements," Transcript of Proceedings, Gagliardi v. United States, No. 06-799T, at 478 (Fed. Cl. Mar. 4-5, 2008) ("Tr."), and agreed with the description of his work in connection with preparing tax returns for Dr. Gagliardi as "accounting from their books and records." Tr. at 376.

Goodman knew plaintiffs quite well and was involved in their personal lives beyond serving as their accountant and tax preparer. Mr. Goodman furnished letters of recommendation in connection with helping plaintiffs to adopt their children. Mr. Goodman also introduced Dr. Gagliardi to dentist clients of his accounting practice who were interested in retiring and selling their practices to Dr. Gagliardi. Dr. Gagliardi ultimately purchased those two practices. Mrs. Gagliardi termed Mr. Goodman's involvement as "convinc[ing] [Dr. Gagliardi] to purchase both practices." Transcript of Proceedings, Gagliardi v. United States, No. 06-799T, at 204 (Fed. Cl. Mar. 4-5, 2008) ("Tr."). Mr. Goodman introduced Dr. Gagliardi to a banker in connection with moving his practice into the same condominium building as Mr. Goodman. Tr. at 462-63. In 2001 Restorative Dentistry shared the same office building as Mr. Goodman's accounting firm.

After plaintiffs married, while they were both working and before Dr. Gagliardi had his own dental practice, plaintiffs would meet annually with Mr. Goodman to provide him with all of their information relevant to the preparation of their personal tax returns, including their Forms W-4 and W-2. Mrs. Gagliardi testified that during these meetings she went through her checkbook, totaled all deposits, and identified for Mr. Goodman all of plaintiffs' expenses. Dr. and Mrs. Gagliardi testified that this practice continued whereby plaintiffs would provide Mr. Goodman with information pertaining to their personal returns during their annual meetings. Mr. Goodman agreed that he would receive orally plaintiff's information relating to personal expenses. Tr. at 419-21.

Plaintiffs testified that, during their annual meetings for the tax years in question, they provided Mr. Goodman with information about the deposits of business income that they made to all of their personal accounts in the same manner that they had done in previous years. Mrs. Gagliardi stated that plaintiffs commingled their business and personal accounts during 2000-2001 and "filed one return, so everything was one for us." Tr. at 193. Mrs. Gagliardi admitted that she had no written evidence that she had provided Mr. Goodman with information pertaining to deposits to the two Fleet bank accounts; however, she was convincing that she compiled a list of deposits that she read off to Mr. Goodman and importuned that "[w]e weren't taking a paycheck, so where else would I get that money to put into that account, or the other account?" Tr. at 194. During these two tax years plaintiffs obtained a loan from her father and reported rental income, because the audit did not uncover any discrepancy (that Mr. Goodman could not explain satisfactorily) for these items. See Tr. at 194-97.

After Dr. Gagliardi opened his first dental practice, Mr. Goodman performed bookkeeping services for Dr. Gagliardi's dental practices. Mr. Goodman was given business records from Dr. Gagliardi's dental practices, including the payroll book, check stubs, business bank account statements, and deposit tickets. Tr. at 129 (testimony of Dr.

Gagliardi), 202 (testimony of Mrs. Gagliardi). From 2000 Mr. Goodman served only as plaintiffs' tax preparer, with the bookkeeping duties assumed by Ms. Downey, who had been working for Mr. Goodman as a contract bookkeeper and whom Mr. Goodman recommended to Dr. and Mrs. Gagliardi.

The court finds that, before the tax years in question, Mr. Goodman handled some degree of bookkeeping for the dental practices before plaintiffs hired Ms. Downey and that he did the same after she left plaintiffs' employ. Ms. Downey has operated her own bookkeeping business since 1996 and was a subcontractor in Mr. Goodman's office before she began work for plaintiffs. She was responsible for what she termed "bookkeeping" for the three dental practices for the tax years in question, but she had no involvement in plaintiffs' personal finances, nor was she attempting to audit, review, or otherwise confirm that the receipts and other documents she received captured all business income. See Tr. at 143 (testifying that she had no knowledge of revenue received by dental practices because responsibilities did not include accounting of revenue from patients). Her role centered primarily on entering into the QuickBooks bookkeeping database the deposits made to business accounts, managing accounts payable for the practices by preparing checks drawn on the business accounts in order to ensure that all the bills were paid, reconciling business bank accounts, and preparing reports from the QuickBooks database to pass through to Mr. Goodman – the balance sheet, profit and loss statements, and supporting documentation, including bank statements and credit card statements. (QuickBooks is a bookkeeping software suite that, among other things, can catalogue bank deposit entries.) Tr. at 145-46.

Mr. Goodman did not perform bookkeeping for plaintiffs during the 2000 and 2001 tax years. He relied on Ms. Downey to provide him with QuickBooks data to prepare the income reported on individual Schedule Cs and the expenses for each of the dental practices. He used both QuickBooks format, *e.g.*, for scheduling depreciation, and Creative Solutions Systems software (another bookkeeping software package) to generate the information required for Schedule Cs. He did not verify that the QuickBooks data were recorded properly. He disclaimed knowledge of any deposits to the Kearny account until Ms. Wieme brought the account to his attention. Tr. at 406-07. Mr. Goodman denied that Mrs. Gagliardi orally gave him the totals of business income deposited into personal accounts and denied that plaintiffs followed a practice of reporting additional business income in this fashion. Tr. at 448-51. These key denials were not credible. The court found Mr. Goodman to be off-hand. He had no records relating to information received in connection with his annual meeting with plaintiffs. The memories of the principals – plaintiffs and Mr. Goodman – were captive to the brevity and informality of these encounters, as well as to their respective self interest. Mrs. Gagliardi is not a fabricator. Dr. Gagliardi and Mr. Goodman are not records people.

## DISCUSSION

I. Motion for partial findings under RCFC 52(c)

At the close of defendant's case-in-chief, plaintiffs moved for a judgment on partial findings pursuant to RCFC 52(c). RCFC 52(c) provides, in pertinent part:

> If during a trial a party has been fully heard with respect to an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence.

A rule 52(c) motion is similar to judgment as a matter of law under Fed. R. Civ. P. 50(a), but differs in important respects. When resolving a motion for judgment as a matter of law, a court must make all reasonable inferences and resolve all issues of credibility in the non-movant's favor. See, e.g., Z4 Techs., Inc. v. Microsoft Corp., 507 F.3d 1340, 1346 (Fed. Cir. 2007) (applying Fifth Circuit law); Applied Med. Res. Corp. v. United States Surgical Corp., 435 F.3d 1356, 1364 (Fed. Cir. 2006) (applying Ninth Circuit law). In contrast, RCFC 52(c) "allows the judge to weigh the evidence presented, but unlike a motion for summary judgment, does not require that the judge resolve all credibility determinations in favor of [the nonmovant]." Fifth Third Bank of W. Ohio v. United States, 56 Fed. Cl. 668, 683 (2003) (citing Howard Indus., Inc. v. United States, 115 F. Supp. 481, 485-86 (Ct. Cl. 1953)), rev'd on other grounds, 402 F.3d 1221 (Fed. Cir. 2005); see also Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc., 231 F.3d 1339, 1345-46 (Fed. Cir. 2000) (discussing corresponding Fed. R. Civ. P. 52(c)).

The principle underlying rule 52(c) is that the party that is charged with the burden of proof must adduce sufficient evidence in support of its claim during its case-in-chief to warrant presentation of its case by the party that does not bear the burden of proof. See Fifth Third Bank, 56 Fed. Cl. at 683. The United States Court of Claims explained:

> "When a court sitting without a jury has heard all of the [nonmovant's] evidence, it is appropriate that the court shall then determine whether or not the [nonmovant] has convincingly shown a right to relief. . . . A [nonmovant] who has had full opportunity to put on his own case and has failed to convince the judge, as trier of the facts, of a right to relief, has no legal right under the due process clause of the Constitution, to hear the [movant's] case, or to

> compel the court to hear it, merely because the [nonmovant's] case is a *prima facie* one in the jury trial sense of the term."

Howard Indus., 115 F. Supp. at 485-86 (quoting United States v. United States Gypsum Co., 67 F. Supp. 397, 417 (D.D.C. 1946), rev'd on other grounds, United States v. United States Gypsum Co., 333 U.S. 364 (1948)).

In a tax refund suit involving the assessment of a fraud penalty, the Government bears the burden of proving fraud by clear and convincing evidence. See Irolla, 390 F.2d at 953 (discussed more fully *infra* Discussion part II). While the Government usually appears as party defendant in cases before the Court of Federal Claims, the court directed the Government to present its case-in-chief first, because it bore the burden of proof. See Tr. at 13-15.

The only two witnesses listed on plaintiffs' witness list were plaintiffs themselves. Defendant also included plaintiffs in their witness list and called both Dr. and Mrs. Gagliardi to testify under Fed. R. Evid. 611(c) (permitting examination of opposing party with leading questions). Because defendant bore the burden of proof and proceeded with its case-in-chief, defendant has had a full opportunity to put on its own case and is not entitled as a matter of right to introduce evidence by way of cross-examination during plaintiffs' case. Neither is defendant entitled to any additional cross-examination of plaintiffs beyond that which was part of the presentation of defendant's case-in-chief. Plaintiffs properly called for a decision solely on defendant's evidence.

## II. Fraud penalties under I.R.C. § 6663(a)

### 1. Fraud standards

The IRS imposed its civil fraud penalty for underpayment pursuant to I.R.C. § 6663(a). The Internal Revenue Code authorizes the imposition of a fraud penalty of "75 percent of the portion of the underpayment which is attributable to fraud" if "any part of any underpayment of tax required to be shown on a return is due to fraud." Id. Although plaintiffs do not dispute that the IRS established an underpayment of taxes, the thrust of their argument is that no part of the underpayment was "due to fraud," because defendant cannot prove by clear and convincing evidence that they had the requisite intent to evade taxes. See Compl. ¶¶ 10, 18-19, filed Nov. 29, 2006; Pls.' Br. filed Jan. 11, 2008, at 4.

The parties agreed on the law pertaining to the assessment of fraud penalties for underpayment of tax. They identified Irolla, 390 F.2d at 951, as the controlling case and cited extensively to Irolla in their pre-trial briefs. See Pls.' Br. filed Jan. 11, 2008, at 5 (cited

five times in six-page brief); Def.'s Br. filed Feb. 12, 2008, at 12, 13, 17. Irolla examined the assessment of a fraud penalty for underpayment pursuant to the predecessor statute to the current fraud penalty statute. Irolla, 390 F.2d at 953. The Court of Claims held that "The term 'fraud,' as used in the statutory provisions authorizing the assessment of civil fraud penalties against taxpayers, means intentional wrongdoing on the part of a taxpayer motivated by a specific purpose to evade a tax known or believed to be owing." Id.

While a taxpayer suing for a tax refund "generally has the affirmative burden of proving all the facts essential to establish his right to recover, a taxpayer suing for the refund of a civil fraud penalty assessed against him and collected from him does not have the burden of establishing freedom from fraud." Id. In such cases the Government "is required to sustain its burden of proof on the issue of fraud by means of clear and convincing evidence." Id. Irolla recognized that the task "is often a difficult one," because ascertaining the "state of the taxpayer's mind, a subjective condition, is crucial in determining the existence or absence of the essential element of fraudulent intent." Id. Cognizant that direct evidence of the subjective state of the taxpayer's mind is not often forthcoming, the Court of Claims allowed the Government to "meet its burden of proof on the issue of fraud by means of circumstantial evidence." Id. Circumstantial evidence would include objective facts that serve as a mechanism to allow courts to infer the requisite subjective state of the taxpayer's mind indicating intentional wrongdoing on the part of a taxpayer motivated by a specific purpose to evade a tax known or believed to be owing. See id.

Lewis Irolla, a "bakery products jobber," operated his business in New York City. Id. at 954. The Court of Claims adopted the findings of the trial commissioner that Mr. Irolla received a substantial amount of taxable income each year from 1946 to 1954, but that he failed to file any federal income tax returns or pay any federal income taxes during that period. The Court of Claims reviewed the circumstantial evidence and concluded that Mr. Irolla had the requisite fraudulent intent to incur a fraud penalty. The court considered six "pertinent factors": (1) Mr. Irolla was a man of extensive business and financial experience; (2) Mr. Irolla was familiar with the income tax system and filed returns prior to the years in question; (3) Mr. Irolla acknowledged that he had taxable income in each of the years during the period 1946-1954; (4) Mr. Irolla did not file any income tax returns over a "long period of time," *i.e.*, nine years; (5) Mr. Irolla's own explanation to IRS agents concerning his failure to file income tax returns for the period in question actually acknowledged his intent to evade the payment of the taxes due; and (6) during a meeting with IRS agents, an agent asked Mr. Irolla whether he had any stocks or bonds and he replied that he had none, when that was not the case. See id. at 954-55.

These six factors do not represent the exclusive factors that courts can consider as circumstantial evidence of the subjective state of the taxpayer's mind. Courts of appeals for

the regional circuits have addressed this issue, and defendant has cited numerous cases in which an appellate court has recited a list of circumstantial evidence of fraudulent intent. These objective indicia often are referred to as "badges of fraud." See, e.g., Morse v. Comm'r, 419 F.3d 829, 832 (8th Cir. 2005) (identifying objective indicia from which fraud can be inferred as "badges of fraud"); Estate of Trompeter v. Comm'r, 279 F.3d 767, 773 (9th Cir. 2002) (same).

2. Badges of fraud propounded by the Government

Defendant argued that six such "badges" showed clearly and convincingly that plaintiffs had the requisite fraudulent intent: (1) concealment though understatement of income in multiple years; (2) concealment of information from accountant and bookkeeper; (3) concealment of assets; (4) inadequate records; (5) failure to cooperate with the IRS; and (6) implausible or inconsistent explanations of behavior. See Def.'s Br. filed Feb. 12, 2008, at 12-21. Defendant characterizes the badges of fraud in this case as "manifest." Id. at 13. Defendant's case-in-chief intended to adduce evidence that these six badges were present as the predicate for an inference of fraudulent intent. A discussion of each badge of fraud follows.

1) Concealment through understatement of income in multiple years

Defendant puts forth case law that a sustained pattern of substantial understatement of income is one objective indicium of fraud that courts should recognize. See Lollis v. Comm'r, 595 F.2d 1189, 1191 (9th Cir. 1979) ("Consistent and substantial understatement of income is itself evidence of fraud."); Anderson v. Comm'r, 250 F.2d 242, 250 (5th Cir. 1957) ("[R]epeated understatements in successive years when coupled with other circumstances showing an intent to conceal or misstate taxable income present a basis on which [a court] may properly infer fraud."); Kurnick v. Comm'r, 232 F.2d 678, 681 (6th Cir. 1956) ("Consistent, substantial understatement of income for several years, as was true here, is highly persuasive evidence of intent to defraud the government . . . . [E]vidence of a consistent pattern of underreporting large amounts of income will support an inference of willfulness." (citations and internal quotation marks omitted)).

Although taxpayers make mistakes in reporting their income on their tax returns, a pattern of substantial understatement of income over multiple years is difficult to characterize as an isolated mistake. In Anderson the taxpayer was a watchmaker who acquired substantial holdings in land and securities. The United States Tax Court found "that part of the deficiencies for [four years were] due to fraud." Anderson, 250 F.2d at 250. The United States Court of Appeals for the Fifth Circuit found no clear error in the Tax Court's finding that "[i]t was apparent from the most cursory search that there was a substantial increase in

taxpayer's net worth during the period that was not reflected in the annual returns filed by him." Id. at 244-45. The Fifth Circuit recognized that "the mere omission of reportable income is not of itself sufficient to warrant a finding of fraud in an income tax case," but that "repeated understatements in successive years when coupled with other circumstances showing an intent to conceal or misstate taxable income present a basis on which the Tax Court may properly infer fraud." Id. at 250.

Lollis involved understatement of income for four tax years. According to the Tax Court's findings, which the United States Court of Appeals for the Ninth Circuit found to be supported, the percentage of gross receipts not reported in each of the four years varied from 43% to 60%. See Lollis, 595 F.2d at 1191. Kurnick involved underreporting of income for seven years. Kurnick, 232 F.2d at 680. The underreporting was substantial; the taxpayer's returns showed a gross profit of 1.15%, while the Commissioner determined — and both the Tax Court and the United States Court of Appeals for the Sixth Circuit affirmed that determination — that the taxpayer's returns should have shown a gross profit of at least 22%. Id.

In the instant case, the underreporting of income covered two years, tax years 2000 and 2001. It warrants mention that these are the same two years that plaintiffs hired Ms. Downey and transferred bookkeeping responsibilities for the three dental practices from Mr. Goodman's firm to Ms. Downey. According to the final Form 4549 dated July 7, 2004, that Mr. Goodman signed on July 14, 2004, as plaintiffs' representative during the IRS audit, the understatement of gross receipts or sales was $68,071.00 in 2000 and $40,621.00 in 2001. DX 10 at 1, ln. 1b, cols. 2-3. The total gross receipts reported by plaintiffs were $398,789.00 in 2000 and $817,551.00 in 2001. See DX 1 at 0055, 0059; DX 2 at 0152, 0154, 0156. The percentage of gross receipts not reported was approximately 14.6% in 2000, and 4.7% in 2001. Plaintiffs' tax returns had individual Schedule Cs attached, each corresponding to one of the two practices in 2000, and each corresponding to one of the three practices in 2001. At trial defendant contended that the percentage of underreporting was much higher by pointing to the percentage underreported on one of these Schedule Cs, in contrast to the sum of the gross receipts reflected on the Schedule Cs for that tax year.

Taxpayers have an option to report all such gross receipts and other business information on one Schedule C; multiple Schedule Cs are not required. Tr. at 456 (testimony of Mr. Goodman). That plaintiffs filed individual Schedule Cs for each dental practice is of no moment. Defendant argues that plaintiffs should have been impressed with the magnitude of underreporting evidenced on the Schedule C for the Union City practice. In 2000 plaintiffs reported gross receipts of $54,072.00 for the Union City practice on a Schedule C to their Form 1040. DX 1 at 0055. The IRS adjusted the total gross income by $68,071.00 to $122,143.00. See DX 10 at 1, ln. 1b, col. 2. In 2001 plaintiffs reported gross receipts of

$58,561.00 for the Union City practice on a Schedule C to their Form 1040. DX 2 at 0152. The IRS adjusted the total gross income by $40,621.00 to $99,182.00. See DX 10 at 1, ln. 1b, col. 3. This assumes that plaintiffs reviewed not only their aggregate business income stated on the Form 1040 itself, but each optional Schedule C. For 2000 and 2001, plaintiffs' adjusted gross income was $46,947.00 and $15,920.00, respectively, against itemized deductions of $32,383.00 and $34,720.00, respectively. See DX 1, at 0051; DX 2, at 0149. The discrepancy would not call out to the taxpayers' attention any underreporting.

The duration of the underreporting is neither sufficiently long nor is its magnitude sufficiently substantial to warrant an inference of fraud where the circumstances were not as grave as those reported in the Anderson, Lollis, and Kurnick decisions.

2) Concealment of information from accountant and bookkeeper

Defendant contends that plaintiffs concealed information about the deposits of business receipts into personal accounts and the existence of the Kearny account from Mr. Goodman and Ms. Downey. Defendant marshals citations to cases holding that "[c]oncealement of information from an accountant is evidence of fraud." Polidori v. Comm'r, 72 T.C.M. (CCH) 1297, 1305 (1996) (citing Korecky v. Comm'r, 781 F.2d 1566, 1569 (11th Cir. 1986)); see also Foster v. Comm'r, 391 F.2d 727, 732 (4th Cir. 1968) ("The evidence does not disclose that [the taxpayer] ever gave [his tax advisor] information concerning all the diversions he was making to his personal use from the New York account or that [the tax advisor] made any examination of that account which would permit [the tax advisor] to prepare correct returns of his income reflecting the taxable effect of these diversions."); United States v. Madden, 300 F.2d 757, 758 (4th Cir. 1962) ("There was evidence of a pattern of concealment of his true income from his accountants with the full knowledge that his returns prepared by them would be incorrect."); DiLeo v. Comm'r, 96 T.C. 858, 863 (1991) (taxpayers "failed to inform the accountant who prepared . . . tax returns of the existence of . . . secret bank accounts"), aff'd, 959 F.2d 16 (2d Cir. 1992).

In Polidori the taxpayer himself testified that he did not inform his accountant about a foreign bank account or interest earned thereon. The taxpayer argued that he did not do so with a specific purpose to evade a tax, but, instead, "because he believed that such income was not reportable until it was physically received, instead of merely being credited to his account." Polidori, 72 T.C.M. (CCH) at 1305. The Tax Court found ample evidence of active concealment. See id. ("[Petitioner] concealed the existence and content of that account by leaving blank that portion of each Schedule B which specifically inquired as to the existence of such assets. Similarly, when he filed his tax returns for [two of the taxable years,] petitioner concealed the existence and content of the foreign account by explicitly

stating on each Schedule B that he did not maintain a foreign account during the taxable year.").

In DiLeo the Tax Court found that the taxpayers "failed to inform the accountant who prepared [the] income tax returns of the existence of the secret bank accounts." DiLeo, 96 T.C. at 863. As in Polidori the taxpayers in question pled guilty to numerous criminal charges relating to their tax fraud, including wilfully and knowingly attempting to evade a tax known to be owing. Id. at 864-65.

Madden was an appellate review of a criminal trial in which the United States Court of Appeals for the Fourth Circuit held that "[f]rom the evidence, it cannot be doubted that [the taxpayer] had full knowledge that the accountants who were to prepare his returns were not being informed of certain specific items of income omitted." Madden, 300 F.2d at 757. This evidence included statements that the taxpayer himself made to IRS agents concerning his understatement of income and his concealment of assets from his accountant. See id. ("This gets them off the hook and puts me on the hook." (internal quotation marks omitted)).

Both Dr. and Mrs. Gagliardi testified that, during every annual meeting with Mr. Goodman, they made available to Mr. Goodman checkbook deposit records that showed deposits of business receipts into personal accounts. They also indicated that this practice continued through the period in which Ms. Downey acted as bookkeeper for the dental practices. The court finds, based on Ms. Downey's cogent testimony, that Ms. Downey had no role in plaintiffs' tax preparation, nor was she charged with any responsibility to record plaintiffs' personal income or expenses. Ms. Downey's role is best characterized as a bookkeeper and manager of accounts payable for the three dental practices.

Mrs. Gagliardi was insistent that Mr. Goodman had to know that she and her husband took no draws from business bank accounts that would provide them income on which they could live. See Tr. at 204 (Mrs. Gagliardi testifying that Mr. Goodman was aware that plaintiffs deposited business income directly into personal accounts because otherwise "I wouldn't have been able to pay my mortgage if I didn't put that money into my account."). 3/ According to plaintiffs, Mr. Goodman was not interested in retaining the checkbook registers. Mr. Goodman sidestepped any allusion of impropriety by stating that plaintiffs met with him in person only to give him information concerning expenses and

---

3/ Plaintiffs had some income from rental properties and a loan from Mrs. Gagliardi's father during the two tax years at issue. The point of Mrs. Gagliardi's testimony, however, was that Mr. Goodman knew that the only source of income sufficient for plaintiffs to live on came from the dental practices.

several other deductions relevant to the preparation of their joint returns. He denied any knowledge of the Kearny account. The court has found that plaintiffs, especially Mrs. Gagliardi, testified more credibly as to what transpired during these meetings with Mr. Goodman. 4/

The court relies on the opportunity afforded it to observe the witnesses' response to questioning by the Government and plaintiffs' counsel. Dr. Gagliardi was a nervous, soft-spoken witness. Mrs. Gagliardi was intense and believable. The court was impressed that she made an effort to apprise Mr. Goodman about the income from the dental practices deposited into the two accounts for which she was responsible. Mrs. Gagliardi related the history of the long business and personal relationship that she and her husband enjoyed with Mr. Goodman and their course of dealings with him. Mr. Goodman was pleasant, smiled, and made concessions in favor of plaintiffs only when his actions as a tax preparer were not in question. Ms. Downey, the only accounting witness without a degree in finance, was refreshingly straightforward. Ms. Wieme was a thorough, practical witness, although nervous, and was flustered during her cross-examination.

The court was at all times aware that Mr. Goodman had legal exposure as plaintiffs' tax preparer and that plaintiffs had a vested interest in defeating fraud penalties. Plaintiffs, on the one hand, and Mr. Goodman, on the other, carefully avoided calling each other liars, and the key witnesses offered scenarios that were plausible. The court credits Mr. Goodman's testimony insofar as he stated that his purpose in the annual face-to-face meeting was obtaining information about plaintiffs' personal expenses and deductions. The court credits plaintiffs insofar as they disclosed deposits orally and stood ready to give Mr. Goodman records of deposits to the personal accounts. Mr. Goodman was careful to minimize any oral disclosure by plaintiffs, and he portrayed their reportorial efforts as bumbling. See Tr. at 422-25 (Mr. Goodman testifying that he was repeatedly either unable to recall whether plaintiffs "orally provide[d] the sum total of [their] total deposits" to the personal accounts or that he was unaware of any such deposits). While he disclaimed any

---

4/ The court was impressed by Mrs. Gagliardi's account of the information that was orally presented to Mr. Goodman or otherwise made available during plaintiffs' annual tax preparation meetings. Mr. Goodman confirmed that Mrs. Gagliardi prepared a tally of deposits made to personal accounts and gave it to Mr. Goodman by an oral recitation and listing of all of their expenses. Tr. at 419-21. Alhough Dr. Gagliardi testified that he "made available" to Mr. Goodman, Tr. at 121, written documentation relating to his Kearny account for the 2000 and 2001 tax years, including "[t]he bank book, bank statements, canceled checks, and the deposit tickets," Tr. at 122, Dr. Gagliardi gave Mr. Goodman only the total deposits. Tr. at 121-24.

intent by plaintiffs to defraud, see Tr. at 174 ("I don't think he intended to defraud anybody."), he provided no safe harbor that either Dr. or Mrs. Gagliardi had disclosed the deposits of revenues from the dental practices into personal accounts, and he denied any knowledge of the Kearny account's existence until Ms. Wieme informed him that she had uncovered it.

The court found plaintiffs to display sincerity and lack of sophistication. Defendant did not refute plaintiffs' testimony that they lived off deposits to the three personal accounts. It would have been an easy matter for defendant to query Mr. Goodman, Ms. Downey, or Ms. Wieme as to whether any of the records in connection with the business accounts showed that either Dr. or Mrs. Gagliardi took any money representing a draw. Indeed, Ms. Downey, a bright, forthright professional, expressed shock that she would fail to record any such draws against receipts for personal expenses. See Tr. at 166-67 ("I've never had such a thing happen. . . . If the actual thing happened, I'd have to code it to shareholder or stockholder loan."). Even one check evidencing payment of any personal expense or a draw in favor of either of plaintiffs from the business accounts would have compromised plaintiffs' insistence that they lived off the business income deposited into their personal accounts. 5/ In this case the absence of any such evidence — testimony from Mr. Goodman, Ms. Downey, or Ms. Wieme or documentation — demonstrates evidence of absence.

Plaintiffs' system of reporting their deposits of business receipts into personal accounts to Mr. Goodman was naive and haphazard, but defendant did not show by clear and convincing evidence that there was a willful and purposeful concealment of those assets from Mr. Goodman or the IRS. The circumstances presented at trial are not sufficiently similar to the those in the cases cited by defendant so as to warrant an inference of fraud.

3) Concealment of assets

Defendant contends that concealment of assets, generally, is a badge of fraud and highlights the concealed and secret nature of the Kearny account. For substantially the same

---

5/ The court does not regard the lack of any evidence that plaintiffs took draws from business accounts to pay themselves as obviating lack of fraudulent intent. Plaintiffs stated that they lived off of deposits to personal accounts of income received from the dental practices and that this had been their regular and ongoing approach since Dr. Gagliardi opened his first dental office. Defendant could have undermined the verisimilitude of this testimony by producing evidence of even one draw in favor of either plaintiff or payment of a personal expense from the business accounts. The Government declined to inquire about any such draws at trial.

reasons as discussed above, defendant has not shown such concealment by clear and convincing evidence. Mr. Goodman testified that he became aware during the audit period of checks that were drawn against the Kearny account and deposited in the business accounts during at least one of the tax years in question, if not both. See Tr. at 474-78. Mr. Goodman characterized these as redeposits because the monies were receipts from a dental practice originally deposited into the Kearny account and later deposited into a business account. Tr. at 475-77. In fact, Ms. Wieme discovered the Kearny account during her examination of deposits into one business account. Tr. at 509-10. As Mr. Goodman indicated, "If there was fraud why would they deposit the money back into the account and record it as income?" Tr. at 475. Defendant provided no convincing response to Mr. Goodman's query. 6/

4) Inadequate records

Defendant maintains that plaintiffs failed to produce adequate records reflecting all their business income because they never advised Ms. Downey and Mr. Goodman that they were depositing dental income into their personal accounts. Defendant cites a number of cases for the general proposition that "[i]nadequate or non-existent records are also a badge of fraud." Lollis, 595 F.2d at 1192; see also McGraw v. Comm'r, 384 F.3d 965, 971 (8th Cir. 2004) ("inadequate records" among the factors that "can establish fraud"); Koscove v. Comm'r, 225 F.2d 85, 87 (10th Cir. 1955) ("In determining whether income tax returns were fraudulently filed, . . . failure to keep proper books and records" is among "proper factors to consider in determining question of fraud."); DiLeo, 96 T.C. at 890 (taxpayers "did not maintain any books or records reflecting transactions made with respect to the secret bank accounts").

In Lollis the underreporting pertained to actual currency, not checks, whose source could not be ascertained. In reviewing the Tax Court's findings regarding the absolute lack of documentation as to the source or nature of that currency, the Ninth Circuit held that "it is an understatement to call the taxpayers' records inadequate." Lollis, 595 F.2d at 1192. In McGraw the underreporting involved both unreported income and fictitious deductions. McGraw, 384 F.3d at 971. The tax avoidance schemes in that case "involved the maintenance of a separate set of manually created invoices, which were incomplete and deliberately excluded from [the company's] computerized accounting system" and "the manipulation of [the company's] accounting system for three years by creating false vouchers for the subcontracting work purportedly performed . . . and submitting those false vouchers

---

6/ During a trial recess, Ms. Wieme reviewed her work papers to verify evidence of any other redeposits from personal accounts to business accounts and confirmed that this appeared to be the singular instance. Tr. at 543-49.

to the accounts payable staff in order to deduct the phony costs." Id. In Koscove the taxpayers "made no pretense of keeping books or records from which true income could be determined." Koscove, 225 F.2d at 87. In DiLeo the court found that the taxpayers "did not maintain any books or records reflecting transactions made with respect to the secret bank accounts." DiLeo, 96 T.C. at 867-68. The court considered the particular facts of the case, among which was the fact that the taxpayers in question pled guilty to numerous criminal charges relating to their tax fraud, including wilfully and knowingly attempting to evade a tax known to be owing. Id. at 863.

For substantially the same reasons discussed above, defendant has failed to make sufficient showings by clear and convincing evidence that warrant an inference of fraud. The degree to which Ms. Downey was or was not informed of plaintiffs' personal finances is irrelevant, unless she saw evidence that plaintiffs were debiting the business bank accounts for any draws or personal expenses. That was not the case.

5) Failure to cooperate with the IRS

Another badge of fraud is the failure to cooperate with the IRS. See Ruark v. Comm'r, 449 F.2d 311, 313 (9th Cir. 1971) ("Taxpayer made numerous misstatements during the course of the tax audit for the years in question — she denied the existence of savings accounts."); Irolla, 390 F.2d at 955 ("[A]gents asked [the taxpayer] whether he had any stocks or bonds and he replied he had none" despite having received dividends and interest from stocks and bonds and having made multiple sales of securities.); Powell v. Granquist, 252 F.2d 56, 61 (9th Cir. 1958) ("'Complete cooperation between petitioners and respondent's agents was never had.'" (quoting DeFranco v. Comm'r, 1950 WL 8095 (T.C. 1950)). In both Irolla and Ruark, the finding of failure to cooperate was premised on actual false statements made by the taxpayer to IRS agents. In Powell the court also observed that the taxpayer's "'cooperation was had only after considerable resistance.'" Powell, 252 F.2d at 61 (quoting DeFranco, 1950 WL 8095).

Plaintiffs' cooperation was evidenced by Mr. Goodman's signing the Form 872 "Consent to Extend Time To Assess Tax" for tax year 2000, which authorized the IRS to continue assessing tax for the year 2000. See DX 26. Had plaintiffs not agreed to this extension, Ms. Wieme opined that the statute of limitations likely would have run on the 2000 tax year during the course of investigation. She was of the view that the IRS would not have pursued investigation of tax year 2000 at all without first securing an extension. Tr. at 568-70.

One strong indication that plaintiffs were uncooperative was their unexplained and unjustified delay in producing the records for the Kearny and two personal Fleet Bank

accounts in response to Ms. Wieme's serial Information Document Requests. They did not deflect that fact by ignoring certified mailing of each notice that Ms. Wieme sent to each plaintiff, copy to Mr. Goodman. Nor did plaintiffs absolve themselves from knowledge that Ms. Wieme had to make repeated requests for information just because they turned over these letters unopened to Mr. Goodman. Ultimately, Ms. Wieme was required to subpoena bank records for the known bank accounts, the two Fleet National accounts. The Kearny account was brought to her attention only due to Dr. Gagliardi's redeposit in a business account of a check drawn from the Kearny account.

The standard is not whether plaintiffs gave inadequate cooperation, but whether they were uncooperative. Plaintiffs did cooperate by authorizing extension of the time to assess tax, thereby allowing the IRS to continue its investigation without making inordinate demands of Ms. Wieme. Given the totality of the circumstances, the court cannot say that defendant proved that plaintiffs were uncooperative with the IRS.

Plaintiffs presented the argument, both at trial and in their pretrial brief, that Mr. Goodman exceeded the scope of his authority by agreeing to the fraud penalty, and particularly by doing so when he was instructed to delay any such final resolution of the audit during plaintiffs' trip to Italy. Plaintiffs spent a not-insignificant amount of their cross-examination attempting to render this point significant. Their argument is unavailing because Mr. Goodman held a valid power of attorney through two Forms 2848 executed by plaintiffs for tax years 2000 and 2001. See DX 11; DX 12. Forms 2848 authorized Mr. Goodman to serve as plaintiffs' representative for all matters before the IRS pertaining both to the filing of each tax return and to the audit period. See id. Mr. Goodman accepted the fraud penalty on behalf of plaintiffs by executing on July 14, 2004, a Form 870 Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment. See DX 9. The Form 870 by its own terms expressly reserved plaintiffs' rights to pursue this refund action. See id. at 000112 ("Your consent will not prevent you from filing a claim for refund . . . .").

Mr. Goodman was less than forthcoming about the assessment of the fraud penalty and his acceptance of that assessment. Plaintiffs maintain that they were totally ignorant of the course of the audit, including the assessment of a fraud penalty. Plaintiffs cannot escape their responsibility for apprising themselves of the nature of the audit because Ms. Wieme sent each of them by certified mail copies of all her Information Document Requests and other written correspondence pertaining to the audit. Mr. Goodman first informed plaintiffs that he was executing the Form 870, agreeing to the fraud penalty, some time after July 7, 2004, when Ms. Wieme gave Mr. Goodman the Form 870, and before July 14, 2004, when the Form 870 was actually executed. See Tr. at 441-42. Mr. Goodman's own discomfort with explaining the fraud penalty to plaintiffs was evident from the setting in which he did

so: the conversation took place in the parking lot outside his office building, which he shares with one of Dr. Gagliardi's practices, and Mrs. Gagliardi credibly testified as to both her shock and dismay with Mr. Goodman's abruptness on that occasion. Tr. 214-16. However questionable Mr. Goodman's choice of venue might have been, plaintiff's arguments that Mr. Goodman exceeded the scope of his authority are immaterial in light of the Forms 2848 they executed authorizing Mr. Goodman to serve as plaintiff's representative for all matters pertaining to the audit period.

6) Implausible or inconsistent explanations of behavior

Whether to infer fraud from evidence tending to show the presence of some or all of these badges of fraud ultimately hinges on whether defendant has shown by clear and convincing evidence that plaintiffs' explanations for their underreporting and other financial actions were inconsistent or implausible. The testimony and other evidence adduced at trial shows that plaintiffs maintained their records concerning business income in a suspect manner. Plaintiffs did not maintain their records in a fashion that an objectively reasonable business would have maintained, nor were the mechanisms that they established to capture business income objectively reasonable due to lack of documentation (assuming that the business bank accounts showed no evidence of any personal draw or draws for personal expenses). The evidence supports a finding that plaintiffs maintained their financial records in a negligent fashion.

The IRS, however, did not assess a negligence penalty, not even in the alternative. See I.R.C. § 6662(a), (b)(1), (c) (providing for 25% penalty when underpayment due to negligence, including "any failure to make a reasonable attempt to comply with the provisions" of the I.R.C.); Treas. Reg. § 1.6662-3(b)(1) (2007) (defining negligence as "any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return," including "any failure by the taxpayer to keep adequate books and records or to substantiate items properly"). In a tax refund suit, the IRS's "determination of negligence is presumed correct, and [plaintiffs] bear the burden of proving otherwise." Novinger v. Comm'r, 61 T.C.M. (CCH) 3024, 3027 (1991) (citing Hall v. Comm'r, 729 F.2d 632, 635 (9th Cir. 1984)); see also Conway v. United States, 326 F.3d 1268, 1278 (Fed. Cir. 2003) ("'The ruling of the Commissioner of Internal Revenue enjoys a presumption of correctness and a taxpayer bears the burden of proving it to be wrong.'" (quoting Transamerica Corp. v. United States, 902 F.2d 1540, 1543 (Fed. Cir. 1990))).

The IRS assessed only the fraud penalty and therefore assumed the burden of proving fraud by clear and convincing evidence. The court is convinced that, at worst, plaintiffs exhibited benign ineptitude in arranging their financial and tax affairs. Both plaintiffs' and

Mr. Goodman's testimony indicated that plaintiffs, since they married, met with Mr. Goodman prior to his preparation and filing of their joint tax returns in order to review all of their checking accounts and provided him with sufficient information to prepare and file their tax returns. Nothing on the record indicates that their practice was any different for the years in question. The court finds that a serious miscommunication occurred. Mr. Goodman obtained the information that he required, and it is more likely than not that plaintiffs orally advised him of information that he did not utilize, *i.e.*, deposit totals from personal checkbook registers. Plaintiffs did not have adequate internal business income controls for accounting, and Mr. Goodman never recommended any to them (nor did they request him to do so).

Based on the record, the court finds it plausible and consistent that, during the transition between having Mr. Goodman's firm handle bookkeeping for the dental practices and Ms. Downey's transfer to Dr. Gagliardi's dental office in the same building, some miscommunication and misunderstanding occurred as to who had responsibility for capturing all of plaintiffs' business income. 7/ Both Mr. Goodman and Ms. Downey believably were skeptical that plaintiffs could summon the required mindset to intend to evade taxes. See Tr. at 446 (Mr. Goodman testifying that "I don't think he intended to defraud anybody. I think they just handled some things wrong. I don't think there [w]as intent."); Tr. at 174 (Ms. Downey testifying that "I think he's an honest, nice guy. He's a good dentist, and he doesn't know anything about accounting. Or computers."). One uncontroverted piece of evidence dispelling intent to defraud was Dr. Gagliardi's redeposit of business income from the Kearny account to a business account.

This was Mr. Goodman's first experience representing client taxpayers who faced a civil fraud penalty. Mr. Goodman testified that he "felt [that he] had to acquiesce" on

---

7/ Mrs. Gagliardi testified plausibly that, when she worked on the payroll for her father's business, Mr. Goodman would send someone to collect all back-up documentation from the salon business, including bank records that showed deposits and cancelled checks. The practice continued after her husband opened his first practice and business account, according to Mrs. Gagliardi, but was discontinued when Ms. Downey took over as bookkeeper. Mr. Goodman denied ever receiving cancelled checks as back-up from plaintiffs. Mrs. Gagliardi did not testify specifically that the records relevant to deposits into personal accounts were collected by Mr. Goodman's office, and the court does not find that Dr. or Mrs. Gagliardi gave the deposit slips for the deposits of dental practice income into personal accounts to office personnel for delivery to Mr. Goodman. The court, however, finds credible testimony that plaintiffs had available the deposit totals for Mr. Goodman's review.

plaintiffs' behalf in the fraud penalty because he could only refute the finding of fraud "with great difficulty." Tr. at 446. Ms. Wieme had mentioned to Mr. Goodman a possible criminal penalty in connection with the understatement of income. Tr. at 470-73. Mr. Goodman opined that he could have refuted the fraud penalty with a different IRS agent than Ms. Wieme. See Tr. at 480 ("Q [by counsel for defendant] [D]id you believe that you could refute the fraud penalty? A . . . . Practically I think I could have with a different agent."). Ms. Wieme admitted on cross-examination that the IRS Group Coordinator who reviewed her audit results determined that the appropriate penalty would be civil and did not indicate that a criminal penalty would be considered. Tr. at 567.

Plaintiffs do not dispute that there was an underreporting of income. The court ascribes the underreporting to plaintiffs' benign ineptitude. Defendant, however, failed to prove by clear and convincing evidence that plaintiffs' underreporting was caused by "intentional wrongdoing on the part of a taxpayer motivated by a specific purpose to evade a tax known or believed to be owing." Irolla, 390 F.2d at 953. For the aforementioned reasons, the fraud penalty assessed on plaintiffs for the tax years 2000 and 2001 cannot stand.

## CONCLUSION

Accordingly, based on the foregoing, and further to the order entered on March 14, 2008, granting plaintiffs' motion for judgment on partial findings pursuant to RCFC 52(c), this memorandum opinion and order constitutes the court's findings of fact and conclusions of law. 8/

Defendant has not met its burden to prove by clear and convincing evidence that the underpayment of tax for the 2000 and 2001 tax years was due to fraud. Plaintiffs are entitled to a refund of the fraud penalties assessed in the amounts of $13,437.75 for the 2000 tax year and $4,305.00 for the 2001 tax year. The Clerk of the Court shall enter judgment for plaintiffs in the amount of $17,742.75, with interest as provided by statute.

**IT IS SO ORDERED.**

No costs.

s/ Christine O.C. Miller

______________________________

**Christine Odell Cook Miller**
Judge

---

8/ The parties argued the RCFC 52(c) motion until 9:00 p.m. on the second day of trial. The court engaged in a robust discussion with counsel for the parties. Not any of the court's comments on the evidence during that argument is to be construed as a finding of fact or an assessment of what either party had proved or not proved.